**Marta WOLFE, Appellant,**

**v.**

**Robert Reese WOLFE, Appellee.**

**No. 08–93–00340–CV.**

Court of Appeals of Texas, El Paso.

Jan. 11, 1996.

Rehearing Overruled March 27, 1996.

---

Thomas W. McQuage, Greer, Herz & Adams, L.L.P., Galveston, for appellant.

Barry K. Radcliffe, Schwab & Radcliffe, L.L.P., Galveston, for appellee.

Before LARSEN, McCLURE and CHEW, JJ.

## OPINION

McCLURE, Justice.

Marta Wolfe ("Marta") brings this appeal from the trial court's entry of a final decree of divorce which divides the community property and awards managing conservatorship of the couple's minor child to Appellee Robert Wolfe ("Robert"). The custody issue was tried to a jury while division of the community property was tried to the court. In four points of error, Marta asserts the trial court erred: (1) in excluding certain demonstrative evidence; (2) in dividing the community property because of the jury's erroneous determination of the custody issue; (3) in dividing the community property because two different trial judges heard the evidence; and (4) in admitting into evidence the entire written opinion of a New Zealand court which contained statements prejudicial to Marta. We affirm.

### SUMMARY OF THE EVIDENCE

Marta and Robert were married twenty-two years and both are well educated professionals. During the early years of the marriage, Robert completed his Ph.D. and became involved in medical research on severely burned children. He worked for a short period at Louisiana State University in New Orleans. When Marta was accepted at Massachusetts Institute of Technology, the parties moved to Boston. Soon thereafter, Robert accepted a research and teaching position at Harvard Medical School. Marta ultimately obtained a bachelor's degree in chemistry and a master's degree in health education. They remained in Boston until 1983, when Robert assumed a research and teaching position at the University of Texas Medical Branch (UTMB) in Galveston. Although Marta was unhappy about relocating, the couple moved and Marta became employed as a faculty associate and served as the director of Robert's laboratory. They purchased a home in Galveston and a vacation home at Lake Tahoe, California. Their son, Freddy, was born in May 1986, and from that point forward, the testimony differs substantially. Marta claimed that she breast-fed Freddy until the age of two, but another witness stated that the breast-feeding continued until Freddy was four years old. At one point, Marta claimed she took Freddy to work with her every day until he was a year and a half, setting up a nursery in her office. At another point she claimed she was a "stay-at-home" mom, and that she did not go back to work once until the day Freddy started school. Robert complained that Marta developed eccentricities which were symptomatic of a gradual erosion of her mental capabilities. He described a personality change over the last three years of

the marriage which manifested itself in wild mood swings and fits of temper, sometimes directed at Robert and sometimes directed at Freddy. Robert claimed she suffered from severe insomnia and depression. The recurring theme of Robert's theory of the custody case was that Marta had an unhealthy obsession with Freddy. Marta admitted that she began traveling a great deal and that she was either at the California home or in New Zealand for some six to eight months of each year during the several years preceding the divorce.

Robert testified that after Freddy's birth in 1986, Marta refused to engage in sexual relations. After four years of celibacy, he commenced an extramarital affair with Susan Fons in 1990. He and Susan maintained a bag of sexual devices which for the most part were kept in his locker at UTMB. Apparently, however, he had brought the bag to his home on one occasion while Freddy and Marta were in California. He claimed that he and Susan had searched for the bag extensively on the date that Marta was scheduled to return to Galveston, but they were unable to find it. Marta claims that on January 16, 1992, she found the bag on Freddy's bed. She testified that the bag had not been there when she put Freddy to bed the night before, leaving the inference that Robert had come into Freddy's room sometime during the night and placed the gym bag on his son's bed. Robert disputed that Marta found the bag in Freddy's room, claiming Marta admitted to him that a cleaning lady had come into the home, found the bag, and given it to Marta. Marta reviewed all of the materials inside and was shocked to learn of her husband's sexual proclivities and his affair. She filed for divorce soon after and requested the termination of Robert's parental rights.

Following a temporary hearing, Robert was awarded regular visitation with his son. He testified that upon learning the court would not terminate Robert's parental rights, Marta became hysterical, screamed that she would not take "half a child," threw a Bible on the table, verbally assaulted the associate judge, and ran out of the courtroom. Marta denied that this episode ever happened. After the hearing, Marta refused to let Robert see Freddy, leaving a letter asking that Robert pick Freddy up in the morning since she could not "make it through the night" without him. Robert was allowed to visit with Freddy the next day. However, when he arrived to pick up Freddy for his next visitation a few weeks later, he found the house completely empty of furniture and Marta and Freddy gone. Marta had admittedly withdrawn substantial sums of money from various accounts, sold her car, moved various pieces of furniture to California, all in violation of the temporary orders. She placed two dogs in a one-year quarantine and found a new home for the third. She and Freddy stayed in California for a few days and then moved to New Zealand. Despite enrolling Freddy permanently in school, making long-term arrangements for her pets, and instructing a New Zealand attorney to advise Robert that he would not be allowed visitation with Freddy, Marta claimed this move was temporary in nature and that she not only was not hiding from Robert, she encouraged him to visit his son. She specifically claimed that Robert knew that she was going to New Zealand. Robert, on the other hand, claimed he did not know where his child was and although he went to California to see if Freddy were at the Lake Tahoe home, he did not check with Marta's mother in New Zealand. Regardless of whether Robert knew of or acquiesced in Freddy's relocation to New Zealand, Marta admitted that she violated the temporary orders by taking Freddy out of Galveston County.

Robert returned to the trial court and was appointed temporary managing conservator. Upon hearing from the New Zealand attorney, Robert began proceedings there to force Freddy's return to Texas. He employed a private investigator to serve Marta with papers of the New Zealand proceeding. The New Zealand court ordered a two week visitation period for Robert and Freddy, and ordered that Freddy not be removed from New Zealand. When Robert tried to exercise this visitation, Marta refused and Robert notified the court. While his application for further orders was under consideration, the court was informed that the New Zealand police were holding Freddy at the Auckland airport, as Marta was attempting to leave the

country for Australia.[1]  The court issued an order directing a constable to immediately return Freddy to Robert and allow them to leave New Zealand.  The court also delivered a written opinion concerning his findings in the case, referencing numerous false sworn affidavits which Marta had made to the court concerning the whereabouts of Freddy and her repeated efforts to deceive both the court and the attorney ad litem.

The trial of the divorce was to a jury for the custody determination, and to the court for visitation and property division.  Judge Ronald Wilson was incapacitated mid-trial because of an aneurism in his femoral artery.  Judge Arthur Lesher was appointed to try the remainder of the case by the presiding judge of the administrative district.  The parties agreed in open court that objections to the visiting judge would be reserved until after the custody jury trial was completed.  Marta's trial counsel reserved the right to recall any and all witnesses to testify concerning property rights.  Marta sought a continuance after the jury phase, and then asserted her rights under the agreement to object to the judge.  Judge Lesher denied both requests.

## STANDARD OF REVIEW

■   Admission or exclusion of evidence is a matter within the trial court's discretion.  *Syndex Corp. v. Dean,* 820 S.W.2d 869, 873 (Tex.App.—Austin 1991, writ denied); *Dudley v. Humana Hosp. Corp.,* 817 S.W.2d 124, 126 (Tex.App.—Houston [14th Dist.] 1991, no writ).  To obtain a reversal of a judgment based upon a trial court's decision to admit or exclude evidence, an appellant must show: (1) that the trial court abused its discretion in making the decision; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment.  *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394 (Tex.1989); Tex.R.App.P. 81(b)(1).  The Texas Supreme Court has recognized that it is impossible to prescribe a specific test for making the latter determination, and calls it a "judgment call entrusted to the sound discretion and good senses of the reviewing court."  *Lorusso v. Members Mut. Ins. Co.,* 603 S.W.2d 818, 821 (Tex. 1980).  This judgment call must be made by an evaluation of the entire case.  *Id.*

■   It has been held that when the evidence is sharply conflicting and the case is hotly contested, any error of law by the trial court will be reversible error under Rule 81(b)(1) of the Texas Rules of Appellate Procedure.  *Lorusso,* 603 S.W.2d at 821; *Nix v. H.R. Management Co.,* 733 S.W.2d 573, 576 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.) (reversing hotly contested case for erroneous admission of evidence).  But the Supreme Court has also stated that errors in admitting evidence will not require reversal unless that evidence controlled the judgment.  *Gee,* 765 S.W.2d at 396.  If other competent evidence of the fact in question appears in the record, the improper admission of evidence will not constitute reversible error.  *Id.* at 397.  Stated another way, evidentiary rulings will not cause reversal unless an appellant demonstrates that the entire case turns on the evidence improperly admitted or excluded.  *Superior Derrick Services v. Anderson,* 831 S.W.2d 868, 876 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Shenandoah Assoc. v. J & K Properties, Inc.,* 741 S.W.2d 470, 493 (Tex.App.—Dallas 1987, writ denied).

## EXCLUSION OF SEXUAL APPARATUS

■   Marta's first point of error complains of the trial court's exclusion of certain exhibits relevant to the sexual practices of Robert.  The exhibits excluded included: a strap-on artificial penis; two vibrators; a vibrator-like device called a "tiger paw;" a bottle of baby oil; a jar of Vaseline; batteries for the electric devices; instructions for the batteries; a nylon cord knotted at one end; a videotape depicting Susan Fons, Robert's paramour,

---

1.  Marta claimed she was simply making a trip to Sydney, Australia on her way back to Galveston and that she would never deny Robert access to Freddy.  She admitted, however, that Australia is 2,000 miles to the west of New Zealand while Galveston is 9,000 miles to the east.  Although she claimed that Quantas Airlines flew only to Australia from New Zealand en route to the United States, the testimony established that at the time she was apprehended, she possessed only a one-way ticket to Sydney.

using a vibrator and Robert and Susan engaging in sexual intercourse; still pictures excerpted from the videotape; a picture of a nude woman's back; three "swinger" magazines;[2] and three magazines containing explicit pornography.[3] The exhibits were offered outside the presence of the jury, and the trial court sustained objections to every exhibit. Most of the exhibits were excluded in response to objections that they were irrelevant and more prejudicial than probative. Pictures excerpted from the videotape were excluded in response to an objection predicated on the best evidence rule. Other items were excluded only on relevance objections. The home video was offered specifically for the purpose of showing Robert's character and fitness as a parent and managing conservator. The trial court excluded it, after a showing in closed court, in response to objections it was irrelevant, cumulative, and more prejudicial than probative. The trial court further justified its ruling after all of the offers, stating:

> The rationale behind my ruling on this is—Freddy hasn't seen any of it. It's accepted. So, at this point in the trial, there's no testimony that Freddy has actually had access to this stuff. There's nothing that makes me believe that he has, not even enough for me to put in front of the jury to decide whether or not they believe it at this point in the trial.
>
> The rationale is all this stuff is inflammatory and inflammatory value far outweighs the probative value as far as the evidence of character, which is important on these cases but not primary issue.
>
> Now, if you in good faith believe you can show bad character by showing that he's contacting swinging singles or whatever these people purport to be, I am going to permit you to examine him on that basis. You can ask him: Did he ever contact anybody in this magazine.... And you can, if he answers in the affirmative, you can ask him which one and if he tells you, then you can read that particular entry,

whatever it is and ask him why; in other words, the questions that you ask to show someone's character or lack thereof because I think that is relevant.

Robert admitted to the jury that he purchased the pornography and the "swinger" magazines which were used for fantasies. He also admitted to making the pornographic video of himself and Susan. He admitted that he had a bag containing pornographic magazines, the video, three vibrator devices, baby oil, and a belt-on device. He denied that the bag contained Vaseline or a nylon rope. He specifically denied any participation in soliciting sexual partners through the magazine advertisements. Furthermore, the parties stipulated that adultery had occurred, and Robert and Susan both testified concerning their adulterous affair.

■ Marta's brief attempts an end run around what happened below. First, she points to the overriding standard in determining managing conservatorship, the best interests of the child. Tex.Fam.Code Ann. § 14.07(a) (Vernon 1986); *Segovia–Slape v. Paxson*, 893 S.W.2d 694 (Tex.App.—El Paso 1995) (orig. proceeding). Marta then notes that the personal morality of the managing conservator and the moral environment to be provided are relevant in determining custody. *T.A.B. v. W.L.B.*, 598 S.W.2d 936, 940 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.). The gist of the argument then seems to be that because Marta's eccentricities were brought out before the jury, Robert's sex toys should have been admitted because they were better evidence of his morality (or lack thereof) than his testimony. Effectively, Marta argues only that the excluded evidence was relevant, and that its exclusion was harmful.

Evidence is relevant if it tends to prove or disprove a fact in issue. Tex.R.Civ.Evid. 401. Relevant evidence is generally admissible. Tex.R.Civ.Evid. 402. Whether or not evidence is admissible is a question for the trial court, including evidence admissible on the

---

2. The "swinger" magazines contain mostly nude pictures of individuals and advertisements by couples seeking others to engage in sexual acts.

3. No mention is made as to whether the pornography is "soft" or "hard core;" it is certainly explicit, containing depictions of oral sex, intercourse, sexual acts among multiple parties, and parties urinating on one another.

showing of some predicate fact. Tex.R.Civ. Evid. 104(a)(b). The trial judge clearly was of the opinion that Marta failed to make a threshold showing that Freddy was exposed to Robert's sexual practices, and that therefore the demonstrative evidence of those practices was irrelevant. *See Schwartz v. Jacob,* 394 S.W.2d 15 (Tex.Civ.App.—Houston 1965, writ ref'd n.r.e.). Furthermore, the trial judge was obviously of the opinion that these items were more prejudicial than probative of Robert's character. Some of the pornographic magazines are downright nasty; all of the other items are in poor taste. Clearly, they are evidence which can lead to a decision on an improper or emotional basis. *See e.g., Federal Savings and Loan Ins. Corp. v. T.F. Stone–Liberty Land Associates,* 787 S.W.2d 475, 494 (Tex.App.—Dallas 1990, writ dism'd). As such, the trial court's ruling does not constitute an abuse of discretion.

■ Even assuming that exclusion was erroneous, Marta has failed to demonstrate harmful error. Robert testified as to the full contents of the bag and what was depicted in the videotape. There is ample other evidence, including Marta's own testimony, as to sexual misconduct of Robert. She claimed he fornicated with numerous lab technicians, secretaries, and co-workers and was often seen in the nude fornicating on Stewart Beach, from which he and his paramours would return sunburned. She testified that Susan participated in the making and distributing of bestiality films which were circulated in the Shriner's Hospital for Crippled Children. Marta also stated that Robert masturbates compulsively and is therefore "crazy"; and that in addition to his frequent heterosexual partners, he engaged in group sex, homosexual sex, bisexual sex, interracial sex, sadomasochistic sex, lesbian sex, and sex with animals. She claimed that Robert's parents are chronic alcoholics and that Robert's mother cross-dressed Freddy on a regular basis and may have even molested him. Taken as a whole, the trial court's exclusion of the evidence does not lead to an improper judgment. Tex.R.App.P. 81(b)(1). Point of Error No. One is overruled.

## DIVISION OF COMMUNITY PROPERTY

Marta's second point of error asserts that the trial court's division of the community estate was erroneous because the designation of managing conservatorship must be reversed. Because we have overruled Point of Error No. One and Point of Error No. Two is predicated upon our sustaining Point of Error No. One, we do not reach the merits.

## ASSIGNMENT OF VISITING JUDGE

At the outset, the parties intended to try the issues of managing conservatorship to a jury and the issues relating to the division of the community estate to the court. Judge Wilson commenced the jury trial, but well into the presentation of evidence, he was forced to absent himself from trial due to health reasons. The parties agreed to formally bifurcate the trial and to allow another judge to preside over the remainder of the jury trial. Marta reserved her right to call or recall any witnesses for purposes of the property phase, and to make objections to which judge would preside over the property trial. At the conclusion of the jury trial and in accordance with the agreement of the parties, Marta requested that Judge Wilson divide the property, apprising Judge Lesher that he had not heard all the evidence regarding the community estate. Judge Lesher denied Marta's requests. Both Marta and Robert were later recalled to testify as to property issues and both sides presented detailed inventories and proposed divisions of property. Citing *Rutherford v. Rutherford,* 554 S.W.2d 829 (Tex.Civ.App.—Amarillo 1977, no writ), Marta now challenges the division of the community estate by Judge Lesher, who replaced Judge Wilson, on the grounds that he had not heard all the evidence.

■ The assignment of visiting or retired judges is governed by Chapter 74 of the Government Code. Parties to civil litigation are entitled to one objection each to the assignment of a judge to hear a case. Tex. Govt Code Ann. § 74.053(b) (Vernon Supp. 1996). Any objection "must be filed before the first hearing or trial, including pretrial hearings, over which the assigned judge is to

preside." *Id.* § 74.053(c). Our analysis of Marta's complaint thus requires that we ascertain whether Marta's oral objection is sufficient and whether it was timely filed. We conclude that it was both insufficient and untimely.

██ The statutory language requiring the "filing" of the objection has been interpreted to require a written document rather than oral objection. *See Kellogg v. Martin,* 810 S.W.2d 302, 305 (Tex.App.—Texarkana 1991, no writ). The transcript before us contains no written objection, nor does the statement of facts reveal any discussion that a written objection was ever filed. Additionally, the record clearly reflects that at the conclusion of the custody trial, the following colloquy occurred:

THE COURT: What is it that we have remaining now?

[Judge Lesher]

MR. RADCLIFFE: The issues remaining are visitation for Marta Wolfe, child support to be paid by Marta Wolfe, and then the issue of division for the property of the community estate.

MR. HOLMES: Before we proceed, at the request of my client, as a result of the verdict on Friday, we would ask at this time for a motion for continuance on the biforcated [sic] portion of the trial.

THE COURT: I would deny that.

MR. HOLMES: It's also my understanding it's my client's desire to proceed through the biforcated [sic] portion with Judge Wilson.... My client has indicated to me that she would ask that Judge Wilson be permitted to continue with the biforcated [sic] portion of the trial. It was my understanding when we agreed to accept a visiting judge that that was the understanding that we would be able to lodge our objections.

My client has indicated to me that because Judge Wilson heard the majority of the evidence with regard to the adultery and the family issues pertaining to various portions of the property, my client has asked me then to ask that we hold this in continuance until Judge Wilson can take the bench back.

THE COURT: Well, the presiding judge of the second administrative district—region, Judge Stovall, is in charge and he assigned me here and, of course, as you all are aware, assigned me to conclude this trial and when that's done, it comes out of the hands of the sitting judge and into the hands of the assigned judge.

So let's proceed. What is it that we have, visitation, child support and what else?

MR. RADCLIFFE: Division of the property.

MR. HOLMES: I take it then my motion for continuance is denied?

THE COURT: Yes, the motion for continuance is denied.

We liken this exchange to the circumstances in *Money v. Jones,* 766 S.W.2d 307 (Tex.App.—Dallas 1989, writ denied). There, the parties were advised at docket call that a visiting judge would hear the case if trial commenced. Money's attorney appeared before the visiting judge with a written motion for continuance and an oral motion to excuse the assigned judge. The judge stated before proceeding with a hearing that if a written objection were filed, he would recuse himself in accordance with the statute. He then asked the attorney whether he wanted to proceed with the motion for continuance or file an objection. Money's attorney responded that he wanted to "reserve" his statutory right to object to the assigned judge but he wanted the court to first consider the motion for continuance. The court denied the continuance, at which point the attorney orally objected to the visiting judge. The judge ruled the objection was untimely. Immediately thereafter, the attorney filed a hand-written objection. The appellate court concluded that because the objection was filed after the first hearing was conducted [the first hearing being the hearing on the motion for continuance], the objection was untimely.

██ Similarly, Marta's trial counsel urged the motion for continuance prior to attempting to assert an objection to Judge Lesher presiding over the property phase of

the trial. We conclude that the objection came too late.[4] Further, assuming error occurred, Marta has not demonstrated that she suffered any harm as a result. Given the fact that Marta was accorded the opportunity to present full and complete testimony on the property issues [including fault], and given the fact that Marta challenges the division of property only to the extent that it was predicated upon Robert's appointment as managing conservator rather than urging any specific challenge to (1) characterization; (2) valuation; (3) an abuse of discretion in the division; (4) a failure to award her a disproportionate division; (5) a complaint that Robert was awarded a disproportionate division; (6) an improper consideration of factors in the division; or (7) any claim of divestiture of separate property, we find no harmful error.[5]

## OPINION OF NEW ZEALAND COURT

Marta's Point of Error No. Four challenges the trial court's admission into evidence of the opinion of the New Zealand court, complete with its comments regarding the activities of Marta and its opinions of the evidence. Marta objected to the opinion on the grounds that it was hearsay. Marta's counsel also stated: "But these documents are being shown [sic] what a foreign court, is what is asking this jury to decide and I think it unduly influences this jury to show that another court has already made a decision outside of the country and it invades the province of this jury to this[.]" The trial court made no ruling on the objections, but it did admit the challenged evidence. While it might appear that Marta waived any error in the admission of this evidence by failing to obtain a ruling on her objection [Tex.R.App.P. 52(a); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991)], we decline to adopt such a hypertechnical construction. Instead, we consider the admission of the evidence an implicit denial of the objection. Nevertheless, the hearsay objection is without merit as the opinion of the New Zealand court was a properly authenticated public record, and therefore excepted from the hearsay rule. *See* Tex.R.Civ.Evid. 803(8), 901(b)(7), and 902(3). The remainder of counsel's statement blurs the distinction of what might otherwise be considered specific objections. His statement that admission of the New Zealand opinion invades the province of the jury does not constitute a valid objection inasmuch as Tex.R.Civ.Evid. 704 specifically provides that testimony in the form of an opinion is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact. Furthermore, even if the statement is twisted into a "more prejudicial than probative" objection, or even an "improper comment on the weight of the evidence" objection, any error is harmless in light of a record replete with similar assertions of Marta's conduct. Tex.R.App.P. 81(b)(1). Finally, a general objection to a unit of evidence as a whole which fails to specifically identify the objectionable portion is properly overruled if any part of it is admissible. When evidence is partially admissible, and partially inadmissible, it is the burden of the party objecting to the evidence to point out what portions are inadmissible and why. *Speier v. Webster College*, 616 S.W.2d 617, 619 (Tex.1981); *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474, 477 (Tex.App.—El Paso 1989, writ denied). Here, Marta failed to specifically point out what portions of the

4. Because we have determined that the oral objection was both insufficient and untimely when urged at the property phase of the trial, we need not address whether Marta could effectively "reserve" her objections to the assignment of Judge Lesher until the conclusion of the jury trial.

5. The trial court made no findings of fact and conclusions of law and none were requested. Therefore, we cannot determine the value of any particular asset which the trial court may have assigned, nor can we determine that any particular valuation fell outside the range of testimony. However, by reviewing the inventories and proposed divisions of property submitted by each party, we are able to ascertain the nature and extent of the community estate. Utilizing Robert's values, it appears that the property was divided with 56 percent awarded to Marta and 44 percent awarded to Robert. Substituting Marta's values leads to a disproportionate division in Robert's favor, with 68 percent awarded to him and 32 percent awarded to Marta. Judge Lesher fashioned a division at variance with each of the parties' proposed divisions. Marta found the court-ordered sale of the California home and the award to Robert of the entire value of his retirement account to be "particularly offensive." However, because Marta does not assign error with regard to these specific provisions, we decline to comment on their propriety.

New Zealand court's opinion were inadmissible,[6] and our examination of the opinion shows that some portions were certainly admissible. Marta denied that she was arrested by the Auckland police for trying to flee from New Zealand with Freddy. She claimed that her Texas attorney had advised her to come back to Galveston some two months before trial and that her New Zealand attorney had recommended that she return to Galveston to resolve the divorce. She took the position that she had no knowledge of any pending matters in New Zealand. Where she was living in New Zealand, how many times she had moved, and what statements she had made to the attorney ad litem in New Zealand were also disputed. Robert's attorney attempted to impeach her testimony with the findings of the New Zealand court which referenced (1) her prior testimony that her attorney had advised her to leave New Zealand before the hearing there, refuting her testimony that she had no knowledge of the proceedings; (2) her arrest by the police for attempting to flee with the child, refuting her testimony that she had not been arrested; and (3) her prior sworn false affidavits with regard to her residence and the location of Freddy, refuting her testimony that Robert knew her whereabouts. Marta repeatedly told the jury that she did not want to interfere with Robert's relationship with Freddy; that Robert knew she had moved with Freddy to New Zealand; that she had encouraged Robert to visit; that she would welcome him with open arms; and that she had invited him to come to New Zealand "to play golf." Thus, the court documents were partially admissible, if only for the limited purpose of impeaching her testimony through her prior admissions and inconsistent statements and for the jury's con-

sideration in determining the credibility of her testimony. They were also relevant with regard to her ability to respect court orders, with regard to her ability to foster a healthy relationship for Freddy with both parents, and with regard to Robert's suit for tortious interference with the parent/child relationship. Her counsel never requested a limiting instruction. Where tendered evidence is admissible for only one purpose, it is the opponent's burden to secure a limiting instruction. *Larson v. Cactus Utility Co.,* 730 S.W.2d 640, 642 (Tex.1987); Tex.R.Civ.Evid. 105(a). Therefore, any error as to the admission of the New Zealand court's opinion is waived. Tex.R.App.P. 52(a).

Having overruled all points of error, we affirm the judgment.

---

6. Marta's counsel further objected as follows:

   Additionally, we would make the objection that there is inadmissible hearsay contained within these documents which shouldn't be presented to the jury.... We would make the same objection with regard to respondent's exhibit no. 15 that it contains hearsay which is clearly inadmissible within this document itself and we would like an opportunity to have the court review this and determine whether or not certain portions can be struck because it contains hearsay within hearsay and I believe that these documents would unduly mislead and cause confusion with a jury.

She asserts that this is a sufficiently specific objection, citing *Hurtado v. Texas Employers' Ins. Ass'n,* 574 S.W.2d 536 (Tex.1978). In *Hurtado,* however, counsel precisely identified portions of the document that constituted hearsay within hearsay. In the New Zealand opinion, the court specifically references statements by Marta herself, which would constitute admissions by a party and which would be specifically exempted from the hearsay rule. Tex.R.Civ.Evid. 801(e)(2). Counsel made no attempt to identify a single instance of double hearsay, nor did he ask the court to allow him adequate time to thoroughly review and sanitize the document.