BOURG CHEMICAL DISTRIBUTING,
INC., et al., Appellants,

v.

Bruce Allen MOSIER, et al., Appellees.

No. 09–95–324 CV.

Court of Appeals of Texas,
Beaumont.

Submitted May 15, 1997.

Decided Oct. 16, 1997.

H. Lee Lewis, Jr., Griggs & Harrison, Houston, for appellants.

David Dies, Dies, Dies & Henderson, Orange, A. Thomas Kajander, Sharpe & Kajander, Houston, for appellees.

Before BURGESS, STOVER and STARR,[1] JJ.

## OPINION

LARRY STARR, Justice (Assigned).

Our Opinion of August 28, 1997, is withdrawn and this Opinion is substituted. Appellants' motion for rehearing is denied.

This is a personal injury products liability case tried to a jury. It is grounded in both strict liability and negligence. The jury found that appellants (Bourg Chemical Distributing and Larry Bourg, hereafter referred to as "Bourg") failed to label a drum of highly flammable chemical solvent as required by federal regulations. Bruce Mosier received serious burn injuries while working in an enclosed potable water tank during the construction of a ferry boat. Bryan Greer was also injured. The jury found the injuries to Mosier and Greer were caused by Bourg's failure to properly label the drum of MEK (methyl ethyl ketone). Judgment for compensatory damages, including loss of consortium for Mosier's wife and children, was entered on the jury's verdict. The trial court disregarded the jury's findings pertaining to punitive damages.

Bourg presents four points of error. The first two points contend the jury's findings that Bourg failed to label the drum of MEK as required by federal regulations and that such failure caused the injuries to Mosier and Greer are supported by no evidence or factually insufficient evidence. In point number three, Bourg contends the trial court erroneously admitted prejudicial evidence concerning Mosier's daughter, i.e., Megan's own unrelated disabilities. By point number four Bourg contends the jury's findings for Megan's loss of parental consortium are not supported by sufficient evidence and are grossly excessive and manifestly unjust.

By cross-point, appellees contend the trial court erred in disregarding the jury's findings of gross negligence, intentional conduct and malice and eliminating the award of punitive damages.

We conclude the trial court's judgment is correct and affirm the judgment. We discuss the points raised under three headings: "Jury Findings on Liability," "Megan's Loss of Consortium," and "Punitive Damages."

## JURY FINDINGS ON LIABILITY

In reviewing a "no evidence" point of error we consider only the evidence tending to support the finding, viewing it in its most favorable light. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990). We must give effect to all reasonable inferences that may properly be drawn from such evidence and disregard all contrary or conflicting evidence. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). If there is any probative evidence, more than a scintilla, supporting the finding, the "no evidence"

---

1. The Honorable Larry Starr, sitting by assignment pursuant to Tex. Gov't Code Ann. § 74.003(b) (Vernon 1988).

point must be overruled. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988).

■ The court's charge instructed the jury that "Federal regulations require a distributor of MEK to print on or affix to each container for sale a red diamond flammable liquid label and to identify the product and the hazard class. This information must be in a form that is durable, weather resistant, and able to withstand, without substantial change in color, a thirty day exposure to conditions incident to transportation that reasonably could be expected to be encountered by the labeled package. A failure to comply with this law is negligence in itself." The jury then found that Bourg failed to label the drum of MEK involved in the occurrence as required by federal regulations, which was a proximate cause of the occurrence, and further found a marketing defect in the marketing of the containers, marketing defect being defined in the charge as being ". . . the failure to give warnings required by law." The marketing defect was found by the jury to be a producing cause of the occurrence.

The evidence shows Orange Shipbuilding was constructing a ferry boat. The wrong type of white paint was put on the interior of a potable water tank. It could not be removed by sand blasting because it was still wet. The paint foreman, Eldon Smith, instructed two painters, Mosier and Greer, to get MEK from one of a number of fifty-five gallon drums containing MEK and wipe the undried white paint from the water tank. Because they were using MEK in an enclosed space without proper ventilation and with an unprotected droplight, a fire resulted causing serious injuries to Mosier and some injury to Greer.

Austin Green testified that at the time of the accident he was the purchasing agent at Orange Shipyard. All of the paint supplies were bought by Orange Shipyard. Green purchased the MEK involved in the accident. It was bought from Bourg. At that time MEK was not purchased from any other source. Records of the purchases were subpoenaed and introduced into evidence. Austin stated that there was no doubt in his mind that Bourg supplied the MEK that Mosier and Greer were using.

Both Mosier and Greer testified about being instructed by Eldon Smith, the paint foreman, to get the MEK, rags and buckets. They both testified that they know what a red diamond decal is and what it looks like. They testified they did not see such a red diamond decal on any of the MEK drums. Greer saw a stencil on the top of the drum from which the MEK was taken showing that the product was MEK, that it came from Bourg and that it is flammable. These circumstances, viewed most favorably from appellees' standpoint, amount to more than a mere scintilla of evidence that Bourg failed to have the proper weather resistant red diamond decals on the drums when delivered to Orange Shipbuilding.

The testimony of the painters, Mosier, Greer and Bem Bembry shows that they knew that MEK is flammable and commonly used by painters to clean equipment. Mosier and Greer did not know that MEK is highly combustible and in a hazard class calling for a red diamond decal. The record indicates that had Mosier seen the red diamond decal, he would have recognized it and thought further about the dangers of MEK. It is a reasonable inference that the absence of the red diamond decal constituted a failure to warn amounting to both a "proximate cause" and a "producing cause" of the accident, but for which the accident would not have occurred. This evidence, in addition to the expert testimony of Dr. Gary Nelson to the effect that the failure to properly label was a cause of the accident constitutes more than a scintilla of evidence on causation. A jury question being raised on both the aspects of improper or defective labeling and legal causation, appellants' no evidence contentions in the first and second points of error are overruled.

In reviewing an insufficient evidence point of error, we consider all of the evidence in the entire record. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660; 661 (1951). We will reverse only if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

In addition to the lay testimony outlined above, there was expert testimony introduced by appellees reinforcing the testimony of the lay witnesses to the effect that the barrels of MEK were from Bourg and that they were not properly marked by the appropriate red diamond decal. As stated above, expert opinion testimony was also presented on causation. On the other hand, Larry Bourg, the manager of Bourg Chemical Distributing, testified that he was aware of the type of warnings required to be placed on the containers of MEK, including the type of product it is, the flammability information and the red diamond decal. In substance he testified that from his personal knowledge the drums of MEK left Bourg's facility with the red diamond decals on them as required. He said he personally handled the drums. There was other testimony about an additional label of a different type on the side of each drum as well as the stencil on the top.

Thus, the jury was presented with the necessity to resolve the conflicting testimony of both interested and expert witnesses. We are of the opinion that the entire record reflects sufficient evidence to support the jury findings. Further, we do not find the jury findings are so against the overwhelming preponderance of the evidence as to be wrong and unjust. We overrule appellants' first and second points contending that the jury findings on improper or defective labeling and legal causation are supported by insufficient evidence.

## MEGAN'S LOSS OF CONSORTIUM

Bourg contends in the third point of error that the trial court abused its discretion in admitting over objection testimony by Dr. Nolan J. LeBlanc and Dr. Bernard L. Rosenfeld concerning injuries and disabilities of Megan Mosier due to her premature birth.

In paragraph XII of appellees' petition, recovery was sought for the children of Bruce Mosier because of injuries to him "pursuant to *Reagan, et al v. Vaughn*." On voir dire examination, appellees' counsel informed the jury that Mosier's wife was five months pregnant, that after remaining with her husband at the hospital for thirty-six hours nonstop, she returned home and went into premature labor, and that Megan's premature birth had these consequences:

... For six months—five to six months Megan, her daughter, stayed in the hospital, Critical Care Unit at St. Luke's Hospital, ran up an incredible medical bill, big dollars for those of you who know what critical care for infants cost.

To this day Megan Mosier is sick. This baby is 3 years old now. This baby has been in the hospital so many times you cannot even count. The baby has been transferred—has been sent to St. Elizabeth Hospital at least three times that I know of for critical care after she got back from St. Luke's. This child has continued to have consistent problems, all kinds of medical problems.

You're going to hear the baby's pediatrician tell you that the baby has permanent neurological damage. You're going to hear the word 'retardation.' It's a hard word to except [sic] for the Mosiers.

Bourg's counsel made the following responsive comment during voir dire examination:

All right. Now, the other aspect of this that Mr. Dies [appellees' counsel] raised was problems relating to the premature birth of Kaylee Mosier's daughter, Megan. We have a serious issue in this case regarding the relationship of that to the incident made the basis of this suit; but since they have raised it, we're going to have to get into it and you're going to hear some evidence on that.

Louise Savoy, Bruce Mosier's mother, testified about the premature birth, the times Megan was in the hospital and the observable physical difficulties the child had.

Bruce Mosier was asked to tell about the kind of problems Megan "has had since her premature birth." His testimony is as follows:

A: Where do I start?

Q: Well, let me just kind of ask you point by point. Has your daughter had respiratory problems?

A: Yes, sir.

Q: Has your daughter had lung problems?

A: Yes, sir.

Q: Has your daughter had recurrent pneumonia?

A: Regularly.

Q: Has your daughter had at least two occasions where she went into seizures?

A: Yes, sir.

Q: Has your daughter had learning problems?

A: Yes, sir.

Q: Has she had speech difficulties?

A: Yes, sir.

Q: Does she have speech difficulties today?

A: Yes, sir.

Q: Okay. Has she been in the hospital all the times that you've heard about?

A: I'd estimate about 50 offhand.

Q: Okay. Have her medical bills exceeded $160,000?

A: Probably more than that. I don't really know, but it's probably more than that.

Q: Okay. Is she being treated by Dr. LeBlanc at this time?

A: Yes, sir.

Dr. Dallas Joseph Moreau, III was called by appellees as an expert witness. He is a licensed professional counselor with experience in family counseling involving burn victims. He testified, among other things, about the problems associated with Megan's birth and the daily care problems the Mosiers were faced with. He counseled them to help them cope with those problems. Dr. LeBlanc opined that Megan is retarded. He counseled them about the retardation.

After the testimony of Megan's mother, the last live witness called by appellees before resting, appellees offered the deposition testimony of Dr. LeBlanc. At that point, outside the presence of the jury, the court heard appellants' objection, as follows:

THE COURT: Do you have an objection you wish to state?

COUNSEL: Yes, Your Honor. Counsel stated that he was going to offer the testimony of Dr. LeBlanc concerning the injuries sustained by Megan Mosier; and our objection is that the testimony offered for that purpose is irrelevant, immaterial, and highly prejudicial to the defendants since there is no evidence that any injury sustained by Megan Mosier, who is the child of Kaylee Mosier, has any causal nexus to the incident made the basis of this suit, that there was any foreseeability of the defendants with respect to the injuries sustained by that child, that the child was in any way a consumer with respect to the product that was allegedly supplied by the defendant, that there is no status or standing on the part of the plaintiffs to assert a claim for bodily injury to the child, Megan Mosier, and therefore the testimony of the witness proffered for that purpose is irrelevant, immaterial, and prejudicial to the defendants, is calculated to suggest to the jury a factor of sympathy, injection of considerations of damages that are not properly to be considered by them in this case.

■ Appellees' counsel argued the mental retardation would affect the child's ability to perceive injury and loss of love, affection, and society of her father. Bourg argued that whether the child was retarded or had an exceptionally high I.Q. should not affect the child's claim for loss of consortium based on injuries received by the father. In the long colloquy, the court posed the question of whether, if the child was blind for reasons unconnected with the defendants, it would affect her claim for loss of consortium and possibly be relevant. Bourg's counsel stated he supposed that it would. The court then pronounced a ruling allowing the proffered testimony to show retardation, but not to show injury by the defendants:

THE COURT: All right. Then, that's my judgment—

. . . .

THE COURT:—that mental retardation, they're entitled to tell the jury this child is mentally retarded.

. . . .

THE COURT: The jury can consider that, I think, in terms of what loss of consortium she may or she may not have.

. . . .

THE COURT: So, I'm saying if the doctor wants to say she's retarded, fine; but as to any evidence that leads to that the premature birth caused the mental retardation, I'm saying I think that's very prejudicial to you. [ i.e., appellants]

. . . .

THE COURT: And I'm ruling that would not be admissible.

Whereupon all counsel and the court went over the deposition testimony of Dr. LeBlanc and Dr. Rosenfeld outside the presence of the jury to implement the court's ruling. Certain deposition testimony was allowed and other deposition testimony excluded in keeping with the court's ruling.

The decision of whether to admit evidence rests within the discretion of the trial court. *E.I. du Pont de Nemours and Co., Inc. v. Robinson,* 923 S.W.2d 549 (Tex.1995). The trial court commits error when it acts without reference to any guiding principles or acts in an unreasonable or arbitrary manner. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–242 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). In order to obtain reversal of a judgment based on an evidentiary ruling it must be shown that the trial court did err and that the error probably resulted in an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). In this case we are persuaded the trial court's ruling was neither arbitrary nor unreasonable. In *Reagan v. Vaughn,* 804 S.W.2d 463, 467 (Tex.1990), the Supreme Court stated:

We hold that children may recover for loss of consortium when a third party causes serious, permanent, and disabling injuries to their parent. . . . The child may recover for such non-pecuniary damages as loss of the parent's love, affection, protection, emotional support, services, companionship, care, and society. Factors that the jury may consider in determining the amount of damages include, but are not limited to, the severity of the injury to the parent and its actual effect upon the parent-child relationship, the child's age, the nature of the child's relationship with the parent, the *child's emotional and physical characteristics,* and whether other consortium giving relationships are available to the child. (Emphasis added.)

By specifically providing the factors pertaining to the child's emotional and physical characteristics, the Supreme Court necessarily contemplated that relevant evidence would be adduced showing what those emotional and physical characteristics are. The trial court's ruling on appellants' objection was therefore correct.

Further it is apparent from the record that the testimony to which Bourg's objection was directed had been placed before the jury in many different ways. It was cumulative of other evidence to which no objection was urged, so it cannot fairly be said that the case turned on the deposition testimony of LeBlanc and Rosenfeld. *Wolfe v. Wolfe,* 918 S.W.2d 533, 538 (Tex.App.—El Paso 1996, writ denied). We overrule appellants' third point of error.

■ In Bourg's fourth point of error, they assert the jury's findings to Question 9 concerning Megan Mosier's loss of parental consortium are not supported by sufficient evidence, and that such award of damages to Megan is grossly excessive and manifestly unjust. The jury awarded $30,000 past and $400,000 future loss of parental consortium damages to Megan, whereas they only awarded $2,000 past and $3,000 future loss of parental consortium damages to each of the other two children.

■ The jury has a wide discretion in fixing the amount of damages to award and the intermediate appellate court must not merely substitute its judgment for that of the jury. *Costa v. Storm,* 682 S.W.2d 599 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The jury's finding on damages cannot be set aside unless it is so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Thompson v. Mercantile Thrift Stores, Inc.,* 650 S.W.2d 120 (Tex.

App.—Houston [14th Dist.] 1983, no writ). In determining whether damages are excessive the court of appeals employs the same test as for any factual insufficiency question. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986).

■ The substance of Bourg's position is that there is no evidence that Megan, because of her particular situation, sustained any loss different from that of her brother and sister insofar as her relationship with her father and the effects of his injuries. That is, that there is no evidence which affords any basis for a distinction among the three children concerning loss of parental consortium. However, individual characteristics of a child are necessarily and expressly made a factor in the award of damages. *See Reagan*, 804 S.W.2d at 467; *See also* James L. Isham, Annotations, "Excessiveness or Adequacy of Damages Awarded for Noneconomic Loss Caused by Personal Injury or Death of Parent," 61 A.L.R.4th 251 (1988). Our examination of the entire record in this case does not demonstrate any prejudice or improper abuse of discretion by the jury in awarding loss of consortium damages to Megan. We hold the evidence is sufficient to support the award. Appellants' fourth point of error is overruled.

## PUNITIVE DAMAGES

By cross point, appellees assert the trial court erred in disregarding the jury's finding of gross negligence and eliminating the award of punitive damages based on the jury's answers to Question Nos. 12, 13 and 14 finding gross negligence, intentional conduct and malice.

■ The trial court's disregard of the jury findings under the punitive damages theories could only be based on a "no evidence" ruling. The traditional "no evidence" test requires the court to consider only the evidence favorable to the jury finding, viewed most favorably in support of the finding, and to disregard evidence to the contrary. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992); *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). The traditional test applies equally to gross

negligence and punitive damages findings. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex.1981). A jury's finding will be upheld as legally sufficient if more than a scintilla of evidence supports it. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497 (Tex.1995); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994).

Appellees have not briefed, supported by authority, or pointed out any testimony or evidence in the record which could support a theory of "intentional conduct" with intent to injure or "malice." A point of error not supported by authority is waived. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 934 (Tex.1983); Tex.R.App. P. 74(f). Also, from the record we can readily see that there is not a scintilla of evidence to support the jury findings in answer to Question Nos. 13 and 14 relating to intentional conduct and malice. Thus, we turn our attention to the question of whether there is legally sufficient evidence to support the jury finding of gross negligence in answer to Question No. 12.

In Question No. 12, the court without objection defined "gross negligence" as follows:

"Gross negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means an entire want of care as to establish that the act or omission in question was the result of actual conscious indifference to the rights, safety or welfare of the person affected.

An appropriate interpretation of the guiding principles pertaining to gross negligence in Texas is now governed by *Transp. Ins. Co. v. Moriel, supra.* A succinct statement of these principles appears in *Universal Services Co., Inc. v. Ung*, 904 S.W.2d 638, 641 (Tex.1995):

We have recently emphasized that the test for gross negligence contains both an objective and a subjective prong. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 21–22 (Tex.1994); *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326

(Tex.1993). Objectively, the defendant's conduct must create "an extreme degree of risk." *Moriel,* 879 S.W.2d at 22; *Wal–Mart,* 868 S.W.2d at 326. *See also Williams v. Steves Industries, Inc.,* 699 S.W.2d 570, 573 (Tex.1985). This component, being a function of both the magnitude and the probability of the potential injury, is not satisfied if the defendant's conduct merely creates a remote possibility of serious injury; rather, the defendant's conduct must create the "likelihood of serious injury" to the plaintiff. *Moriel,* 879 S.W.2d at 22. Subjectively, the defendant "must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others." *Moriel,* 879 S.W.2d at 23. Evidence of simple negligence will not suffice to prove either component of gross negligence. *See Wal–Mart,* 868 S.W.2d at 327.

■ In this case the record reflects that both Greer and Mosier, each a journeyman painter, were sent by their supervisor, Smith, specifically to get MEK to clean the undried unsuitable paint from the interior of the potable water tank on the ferry under construction. They both knew what MEK is (that is, that it is commonly used to clean paint brushes, spray guns and other painting equipment) and where the drums of MEK were located at the Orange Shipbuilding Company. They knew the drums were stenciled to show the drums contained MEK and show that it was flammable. What they did not know and appreciate is the potency and volatility of MEK as a combustible agent. If the MEK drum had been properly labeled with the correct red diamond symbol (rather than a mere stencil indicating flammability) it would have "started them to think." This "thinking" may have led them to the appropriate Material Safety Data Sheet which, in turn, would have apprised them of the dangers of using MEK in an inadequately ventilated enclosed tank in the presence of an unprotected light or electrical fixture.

The record fairly reflects that Bourg furnished to the product purchaser, Orange Shipbuilding Company, the Material Safety Data Sheet on MEK showing the risks and hazards of using MEK in an enclosed space. In fact, appellees' counsel told the jury on voir dire:

> ... the evidence is going to show that Orange Shipbuilding had received and had on file the Material Safety Data Sheet that showed how dangerous this product was; but the evidence is also going to show that they never bothered to give it to the painters or to offer them any advice on how to use this product.

The information breakdown, which resulted in the two painters not having the information available from the Material Safety Data Sheet on MEK furnished by appellants, cannot fairly be attributed to appellants. A red diamond flammable liquid label required under the court's charge would have identified the product and its hazard class. It would not, itself, have conveyed the information in the Material Safety Data Sheet on MEK.

Under these circumstances it cannot be said that a fact issue has been raised that appellants had the "actual" conscious indifference necessary to fulfill the subjective prong of the gross negligence test under *Moriel, supra.* We hold that under the undisputed evidence in this case there is not a scintilla of evidence to show *both* that the act was likely to result in serious harm *and* that the defendant (Bourg) was consciously indifferent to the risk of harm. Appellees' cross point is overruled.

We affirm the judgment of the trial court.

AFFIRMED.